**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| CP Holdings LLC, *et al.,* | Case No. 21-[●] ([●]) |
| Debtors.[1] | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS**
**(I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING,**
**(II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE**
**CLAIMS, (III) MODIFYING AUTOMATIC STAY,**
**AND (IV) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (the "Debtors"), through their

proposed undersigned counsel, hereby file this motion (the "Motion") seeking entry of an interim

order, substantially in the form attached hereto as **Exhibit A** (the "Interim DIP Order"), and a

final order (the "Final DIP Order" and, together with the Interim DIP Order, the "DIP Orders"),

pursuant to sections 105, 361, 362, 363(b), 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1),

364(e), 503, 506(c), and 507 of title 11 of the United States Code (the "Bankruptcy Code"), rules

2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules") and rules 2002-1(b), 4001-2, and 9013 of the Local Rules of Bankruptcy

Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the

"Local Rules"): (a) authorizing the Debtors to obtain postpetition secured financing in the form

of the Debtor-in-Possession Credit Agreement dated as of June 20, 2021 (the "DIP Agreement")

---

[1]        The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification
number, as applicable, are as follows: CP Holdings LLC (6188) and Pacrim U.S. LLC (0479).  The Debtors'
mailing address is 3141 Hood Street, Suite 220, Dallas, TX 75219 c/o Sean Broadbent (solely for purposes
of notices and communications).

attached **Exhibit A** to the Interim DIP Order; (b) granting related liens and superpriority claims; (c) modifying the automatic stay to the extent necessary, and (d) granting related relief, including scheduling a final hearing (the "Final Hearing") to consider entry of the Final DIP Order.  In support of the Motion, the Debtors rely on the *Declaration of Marc Weinsweig, Independent Manager of the Debtors, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"); and (c) respectfully state as follows

**PRELIMINARY STATEMENT**

1.      The Debtors seek authorization to enter into a superpriority, senior secured, debtor in possession financing in an aggregate principal amount of up to $3,000,000, with up to $410,000 available upon interim approval of this Motion (the "DIP Loan").  The DIP Loan will allow, and is necessary for, the Debtors to fund their ordinary course operating expenses while enacting a competitive and thorough sale process.

2.      If approved, the Debtors will use the proceeds of the DIP Loan to, among other things, fund the Debtors' restructuring efforts, including the marketing and sale of substantially all of their assets (including their membership interests), and the administration of the Debtors' chapter 11 cases.  Obtaining an immediate injection of cash is critical.  Without the liquidity provided by the DIP Loan, the Debtors will be unable to effectuate their restructuring efforts, preventing the Debtors from maximizing the value of their estate for all stakeholders.

3.      For these reasons, and for the reasons set forth below and in the First Day Declaration, the Debtors believe, in the exercise of their business judgment, that incurrence of the DIP Loan will maximize value for the Debtors' stakeholders.  Accordingly, the Debtors respectfully request that the Court enter the DIP Orders authorizing the Debtors' access to the DIP Loan.

## JURISDICTION, VENUE, AND STATUTORY BASES

4.      The United States Bankruptcy Court for the District of Delaware (the "Court")

has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended*

*Standing Order of Reference* from the United States District Court for the District of Delaware,

dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. §

157(b)(2).  The Debtors confirm their consent, pursuant to Bankruptcy Rule 7008 to entry of a

final order by the Court in connection with this Motion to the extent that it is later determined

that the Court, absent consent of the parties, cannot enter final orders or judgments in connection

herewith consistent with Article III of the United States Constitution.

5.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      The statutory bases for the relief requested herein are sections 105, 361, 362,

363(b), 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, 506(c), and 507 of the

Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, and Local Rules 2002-

1(b), 4001-2 and 9013.

## RELIEF REQUESTED

7.      By this Motion, the Debtors seek entry of the DIP Orders:

(a)      authorizing the Debtors to obtain the DIP Loan consisting of (a) $410,000 upon entry of the Interim Order and (b) to up $3 million upon entry of the Final Order pursuant to the terms of the DIP Agreement entered into by and among the Debtors, as borrowers, and Tor Asia Credit Master Fund, LP, as lender (the "Prepetition Lender" or the "DIP Lender")

(b)      authorizing the Debtors to execute and deliver the DIP Agreement and any related security agreements and all other agreements, instruments and documents related thereto (the "DIP Documents") and to perform their respective obligations thereunder and to perform such other and further acts as may be required in connection with the DIP Documents;

(c)      granting the DIP Lender allowed superpriority administrative expense claim status, subject to the Carve-Out (defined in the DIP Orders);

3

(d)      granting to the DIP Lender automatically perfected security interests in and superiority liens on all of the DIP Collateral (as defined in the DIP Orders), including, without limitation, all property constituting "cash collateral" as such term is defined in section 363(a) of the Bankruptcy Code and any cash or cash equivalents received by the Debtors after the Petition Date;

(e)      authorizing the Debtors to use "cash collateral" of the Prepetition Lender in accordance with an approved budget and the DIP Documents and granting adequate protection in connection therewith;

(f)      approving the stipulations by the Debtors in the DIP Orders with respect to the liens and claims of the Prepetition Lender under the Credit Agreement (defined herein);

(g)      scheduling a Final Hearing within approximately 30 days of the commencement of these chapter 11 cases to consider entry of the Final DIP Order; and

(h)      granting related relief.

## CONCISE STATEMENT PURSUANT TO BANKRUPTCY RULE 4001 AND LOCAL RULE 4001-2

8.      As required by Bankruptcy Rule 4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule 4001-2, together with references to the applicable section of the Interim Order, the Debtors submit the following concise statement of the material terms of the DIP Facility:[2]

| Bankruptcy Code/Local Rule | Summary of Material Terms | Location |
|---|---|---|
| **Borrowers**<br>Bankruptcy Rule 4001(c)(1)(B) | CP Holdings LLC<br>Pacrim U.S., LLC | ¶ (i) |
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | N/A | N/A |

---

[2] This concise statement is qualified in its entirety by, and subject to, the DIP Documents. To the extent there is any conflict between this concise statement and the DIP Documents, the terms of the DIP Documents shall control. Capitalized terms used but not otherwise defined in this concise statement shall have the meaning given to such terms in the DIP Agreement or the Interim DIP Order, as applicable.

| Bankruptcy Code/Local Rule | Summary of Material Terms | Location |
|---|---|---|
| **DIP Lender** Bankruptcy Rule 4001(c)(1)(B) | Tor Asia Credit Master Fund LP | ¶ (i) |
| **Term** Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B), Local Rule 4001-2(a)(ii) | The earlier of the date the Sale Transaction or Alternative Sale Transaction closes and September 17, 2021; provided, that the Lender and Borrowers may mutually agree to extend such date. | ¶¶ 26, 28 |
| **Commitment** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(ii) | Tor is committing to provide up $1.5 million of post-petition financing and may, in its sole discretion, elect to commit a further $1.5 million. | ¶ (i) |
| **Conditions of Borrowing** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(ii) | The obligation of Tor to make advances with respect to the DIP Loan is subject to the following conditions precedent: (a) the Lender shall have received a fully executed counterpart of the DIP Agreement from each borrower; (b) the DIP Orders shall have been entered by the Bankruptcy Court in form and substance acceptable to Tor; and (c) each of the representations and warranties made by each borrower shall be true and correct in all material respects. | Exhibit A (DIP Agreement) |
| **Interest Rates** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(ii) | The DIP Loan shall bear interest at a fixed rate per annum equal to 10% calculated on the basis of a 360-day year for the actual number of days elapsed.  After the occurrence and during an Event of Default, the interest rate shall be 12% per annum, compounding on the first Business Day of each month, monthly | Exhibit A (DIP Agreement) |
| **Use of DIP Financing Facility** 4001(b)(l)(B)(ii) Local Rule 4001-2(a)(i) | The Debtors shall use advances of credit under the DIP Loan only for the purposes specifically set forth in this Interim Order and the DIP Agreement, and in compliance with the Approved Budget, subject to the Permitted Variances, and the terms and conditions in this Interim Order and the DIP Documents. | ¶ 9 |
| **Adequate Protection** Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | As adequate protection for any Diminution of the Prepetition Lender's interest, the Prepetition Lender shall receive: (a) continuing valid, binding, enforceable and | ¶¶ 13, J |

| Bankruptcy Code/Local Rule | Summary of Material Terms | Location |
|---|---|---|
| | perfected postpetition replacement liens pursuant to sections 361, 363(e), and 364(d)(l) of the Bankruptcy Code on the DIP Collateral, which shall be subject and subordinated only to the Carve-Out, the DIP Liens and Prepetition Permitted Liens (the "Replacement Liens") and which (x) shall otherwise be senior to all other security interests in, liens on, or claims against the DIP Collateral, and (y) shall not be made subject to or pari passu with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases and shall be valid and enforceable against any trustee appointed in any of the Chapter 11 Cases or any Successor Cases, and shall not be subject to sections 510, 549 or 550 of the Bankruptcy Code; (b) administrative superpriority expense claims in each of the Chapter 11 Cases (the "Adequate Protection Superpriority Claims"), junior and subordinate only to the Carve-Out and the DIP Obligations, pursuant to section 507(b) with priority over any and all other administrative expenses, administrative expense claims and unsecured claims against the Debtors or their Estates, now existing or hereafter arising, of any kind or nature whatsoever as to and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code.<br><br>The application of section 507(b) of the Bankruptcy Code is not limited in the event that the adequate protection provided to the Prepetition Lender hereunder is insufficient to compensate for any Diminution of their respective interests in the Prepetition Debtor Collateral during the Chapter 11 Cases or any Successor Cases. | |
| **Fees**<br>Bankruptcy Rule 4001(c)(1)(B) | There are no fees due under the DIP Agreement. | N/A |

62815/0001-40809166v2

| Bankruptcy Code/Local Rule | Summary of Material Terms | Location |
|---|---|---|
| Local Rule 4001-2(a)(ii) | | |
| **Funding of Non-Debtor Affiliates With DIP Loan** Local Rule 4001-2(a)(i)(D) | The Debtors act as a paymaster for certain non-debtor affiliates | N/A |
| **Budget and Variance Covenant** Bankruptcy Rule 4001 (c)(1)(B) Local Rule 4001-2(a)(i)(E) | Permitted Variance means a Disbursement Variance up to 15% on a cumulative basis from the Approved Budget. | ¶¶ 16, 17 Exhibit B |
| **Events of Default** Bankruptcy Rule 4001(c)(l)(B) Local Rule 4001-2(a)(i)(M) | The events of default under the DIP Loan (each, an "Event of Default," and collectively, the "Events of Default") include usual and customary events of default, including but not limited to: (a) (i) the Borrowers shall fail to pay any principal of the Loan when the same shall become due and payable or (ii) the Borrowers shall fail to make any other payment under any Loan Document, in each case under this clause (ii) within three Business Days after written notice from Lender; or (b) any representation or warranty made by each Borrower (or any of their respective officers) under or in connection with any Loan Document shall prove to have been incorrect in any material respect when made; or (c) the Borrowers shall fail to perform or observe any term, covenant or agreement contained in Section 7.05, Section 7.12, Section 7.13 or Article VIII of this Agreement or any provision of the DIP Orders; or (d) the Borrowers shall fail to perform or observe in any way any other term, covenant or agreement contained in any Loan Document on its part to be performed or observed if such failure shall remain unremedied for ten (10) Business Days; or (e) if the Interim DIP Order, Final DIP Order or Sale Order is stayed, reversed, vacated, modified or amended (except as modified or amended with the prior written consent of the Lender, which consent may be withheld in its sole discretion); or (f) any Collateral | ¶ 27 |

| Bankruptcy Code/Local Rule | Summary of Material Terms | Location |
|---|---|---|
|  | Document after delivery thereof and after giving effect to the DIP Orders shall for any reason (other than pursuant to the terms thereof) cease to create a valid and perfected first priority lien on and security interest in the Collateral purported to be covered thereby; or (g) any Borrower shall institute any proceeding or investigation or support the same by any other Person who may challenge the status, validity, perfection or priority of the Liens on the Collateral created by the Loan Documents; or (h) any Borrower shall, without the consent of the Lender, (i) file a plan of reorganization or liquidation or a disclosure statement, or any amendment to any such plan or disclosure statement or (ii) file a motion seeking approval of any sale or bid procedures for a sale of assets other than the Sale Transaction or an Alternative Sale Transaction; or (i) the entry of an order appointing a trustee in the Bankruptcy Cases or an examiner having enlarged powers (beyond those set forth under Bankruptcy Code § 1106(a)(3) and (4)); or (j) without Lender's consent, the entry of an order dismissing the Bankruptcy Cases or converting the Bankruptcy Cases to a case under Chapter 7 of the Bankruptcy Code; or (k) the entry of an order granting any other super-priority claim or Lien equal or superior in priority to the Lien securing the Obligations granted to the Lender or to the Liens securing the Prepetition Debt, other than the Carve-Out, without the Lender's prior written consent; or (l) the entry of one or more orders granting relief from the automatic stay so as to allow third parties to proceed against any asset; or (m) the entry of an order staying, reversing, vacating or otherwise modifying the Loan or any Liens securing the Obligations (or the validity or first priority status thereof); or (n) the entry of an order approving the sale of any of either Borrower's assets other than an order approving the Sale Transaction or an Alternative Sale Transaction; or (o) any |  |

| Bankruptcy Code/Local Rule | Summary of Material Terms | Location |
|---|---|---|
| | Borrower shall have failed to comply with a DIP Milestone within the time periods permitted for compliance; or (p) the payment of any prepetition claims (other than as permitted by the DIP Orders or pursuant to an order entered in the Bankruptcy Cases that is supported, or not objected to, by the Lender); or (q) the Borrowers shall fail to comply with the Approved Budget (subject to the Permitted Variances). | |
| **Liens on Unencumbered Assets**<br>Local Rule 4001-2(a)(i)(G) | The DIP Collateral includes unencumbered assets. | ¶ 5 |
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(i)(H) | The Debtors shall be required to comply with the following items set forth in this Annex A within the timeframes set forth below:<br><br>(i)   On or before June 25, 2021, the Interim DIP Order shall have been entered by the Bankruptcy Court;<br><br>(ii)   On or before the day that is 2 Business Days following entry of the Interim Order, the Debtors shall file the Debtors' Answer in the adversary proceeding to be commenced by the DIP Lender and Mr. Andrew Oksner contemporaneously with the filing of the Bankruptcy Cases;<br><br>(iii)   On or before July 16, 2021, the Final DIP Order shall have been entered by the Bankruptcy Court;<br><br>(iv)   On or before September 3, 2021, the Bankruptcy Court shall have entered an order authorizing a 363 Sale Transaction; and<br><br>(v)   On or before September 17, 2021, the Debtors shall have consummated the 363 Sale Transaction. | ¶ 28 |

62815/0001-40809166v2

| Bankruptcy Code/Local Rule | Summary of Material Terms | Location |
|---|---|---|
| **Prepayment Penalty** Local Rule 4001-2(a)(i)(I) | N/A | N/A |
| **Joint Liability** Local Rule 4001-2(a)(i)(J) | N/A | N/A |
| **Payment of Secured Parties' Fees Without Review** Local Rule 4001-2(a)(i)(K) | N/A | N/A |
| **Use of Estate Funds for Investigations** Local Rule 4001-2(a)(i)(L) | Proceeds from the DIP Facility and/or Cash Collateral not to exceed $25,000 in the agreement may be used on account of Professional Fees incurred by Committee Professionals (if any) in connection with the investigation of avoidance actions or any other claims or causes of action (but not the prosecution of such actions) on account to the Prepetition Facility and Prepetition Lender (but not the DIP Facility). | ¶ 33(i) |
| **Cross-Collateralization and Administrative Expense Status** Local Rule 4001-2(a)(i)(N) | Subject to the Carve-Out, the DIP Lenders are granted allowed superpriority administrative expenses claims. | ¶ 7 |
| **Roll Up** Local Rule 4001-2(a)(i)(O) | N/A | N/A |
| **Non-Consensual Priming Liens** Local Rule 4001-2(a)(i)(P) | N/A | N/A |
| **Provisions Approving All Terms of the Loan Agreement** Local Rule 4001-2(a)(i)(R) | N/A | N/A |
| **Provisions Limiting Arguments** Local Rule 4001-2(a)(i)(T) | N/A | N/A |
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) | Section 11.12 of the DIP Agreement provides for indemnification to the Tor and its affiliates for claims arising of our or in connection with the DIP Agreement, the other Loan Documents, the proceeds of the DIP Loan; provided, however, the indemnification shall not extend to have resulted from bad faith, gross negligence, willful misconduct or | Section of 11/12 of the DIP Agreement |

| Bankruptcy Code/Local Rule | Summary of Material Terms | Location |
|---|---|---|
| | breach of the DIP Agreement or any other Loan Document. | |
| **Entities with Interests in Cash Collateral** Bankruptcy Rule 4001(b)(l)(B)(i) | No entities other than the Prepetition Lender have an interest in the Cash Collateral. | N/A |
| **Carve Out** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(i)(F) | As used in the Interim Order, "<u>Carve-Out</u>" means the sum of: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate; (ii) fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) subject to the Approved Budget, to the extent allowed at any time, whether by interim or final compensation order, procedural order or otherwise, all unpaid fees and expenses incurred by persons or firms retained by the Debtors pursuant to section 327, 328 or 363 of the Bankruptcy Code (collectively, the "<u>Debtor Professionals</u>") and any Committee (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals, the "<u>Professional Persons</u>") appointed in the Chapter 11 Cases pursuant to section 1103 of the Bankruptcy Code (all such unpaid fees and expenses of the Professional Persons, the "<u>Professional Fees</u>") at any time prior to the delivery by the DIP Lender of a Carve-Out Trigger Notice (as defined below), but excluding any success fees or transaction fees to the extent not paid and due as of the delivery of the Carve-Out Trigger Notice (as defined herein) and allowed by order of the Court as of such date; and (iv) Professional Fees incurred after delivery by the DIP Lender of the Carve-Out Trigger Notice (including transaction fees or success fees earned or payable to a Professional Person), to the extent allowed at any time, whether by interim order, procedural order or otherwise | ¶ 33 |

| Bankruptcy Code/Local Rule | Summary of Material Terms | Location |
|---|---|---|
| | in an aggregate amount not to exceed $200,000 for the Debtor Professionals and $50,000 for Committee Professionals (the amount set forth in this clause (iv) being the "Post-Carve-Out Trigger Notice Cap"). | |
| **Liens and Priorities** Bankruptcy Rule 4001(c)(l)(B)(i) Local Rule 4001-2(a)(i)(D) and (G), 4001-2(a)(ii) | The DIP Lender is granted, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on (collectively, the "DIP Liens") all assets, real and personal property, whether now existing or hereafter arising and wherever located, tangible and intangible, of each of the Debtors and their respective Estates, of any kind or nature, now existing or hereafter acquired, currently encumbered or unencumbered, arising or created, and wherever located, including without limitation: all cash, accounts, accounts receivable, goods (including inventory, equipment and furniture), documents (including, if applicable, electronic documents), fixtures, instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), equity interests, securities and all other investment property, interests in real estate, leasehold interests, commercial tort claims, general intangibles (including all payment intangibles), the Debtors' rights and interests under any permits or licenses issued by any governmental entity (to the fullest extent allowed under applicable state and/or local law), money, deposit accounts (and all amounts on deposit therein from time to time), patents, copyrights, trademarks, other intellectual property, licenses of any intellectual property, any other contract rights or rights to the payment of money, books and records, all supporting obligations, any insurance, indemnity, warranty or guaranty payable to any of the Debtors from time to time, any claims and causes of action of the | ¶ 6 |

12

| Bankruptcy Code/Local Rule | Summary of Material Terms | Location |
|---|---|---|
| | Debtors, including, without limitation all Prepetition Collateral (as defined in the DIP Agreement), and all proceeds, rents, products, accessions to, replacements for and substitutions of any of the foregoing (collectively, the "<u>DIP Collateral</u>"). | |
| **506(c) Waiver** <br> Bankruptcy Rule 4001(c)(l)(B)(x) <br> Local Rule 4001-2(a)(i)(V) | The security interests in favor of the DIP Lender, and subject to entry of the Final Order, the Prepetition Lender shall not be surcharged pursuant to section 506(c) of the Bankruptcy Code or otherwise. | ¶ 45 |
| **Section 552(b)** <br> Bankruptcy Rule 4001(c)(l)(B) <br> Local Rule 4001-2(a)(i)(W) | The DIP Lender, and subject to entry of the Final Order, the Prepetition Lender, shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Lender or the Prepetition Lender, as applicable with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral or DIP Collateral, as applicable. | ¶ 47 |
| **Stipulations to Prepetition Liens and Claims** <br> Bankruptcy Rule 4001(c)(1)(B)(iii) <br> Local Rule 4001-2(a)(i)(Q) | Without prejudice to the right of a third party to raise a Challenge, the DIP Orders contain stipulations as to the validity of the Prepetition Lender's liens and claims. | ¶ 6 |
| **Challenge Period** <br> Bankruptcy Rule 4001(c)(l)(B) <br> Local Rule 4001-2(a)(i)(Q) | To challenge the Debtors' Stipulations, any party in interest must answer or otherwise respond to the Adversary Complaint or intervene in the Adversary Proceeding by no later than 30 calendar days following the date of entry of the Interim Order. | ¶ 42 |
| **Waiver/Modification of the Automatic Stay** <br> Bankruptcy Rule 4001(c)(1)(B)(iv) <br> Local Rule 4001-2(a)(i)(S) | The automatic stay will be modified to the extent necessary for the DIP Lenders to perfect the DIP Liens and for the exercise of remedies upon the existence of an Event of Default. | ¶ 18 |

62815/0001-40809166v2

| Bankruptcy Code/Local Rule | Summary of Material Terms | Location |
|---|---|---|
| **Liens on Avoidance Actions**<br>Local Rule 4001-2(a)(i)(U) | Subject to entry of the Final Order, DIP Collateral shall also include any and all proceeds of rights, claims and causes of action that may be asserted by the Debtors or their Estates under Chapter 5 of the Bankruptcy Code. | ¶ 5 |
| **Provisions that Limit the Court's Discretion**<br>Local Rule (2)(i)(C) | N/A | N/A |

## RELEVANT BACKGROUND

### I.    General Background

9.    The Debtors and their non-Debtor subsidiaries (collectively, the "Company") have their corporate headquarters in Dallas, Texas.  Debtor CP Holdings is incorporated in Nevada and Debtor Pacrim is incorporated in Delaware.  The Company's core business is developing, and operating aged-care assisted living and memory care residences owned in whole or part by the Company and third parties.  The  Company's owned and managed facilities are currently located in the States of Alabama and Texas.

10.    The Debtors' business operations, corporate and capital structures, and restructuring efforts are described in greater detail in the First-Day Declaration.

### II.    Debtors' Prepetition Capital Structure

11.    As of the Petition Date, the Company's liabilities total approximately $83,006,256.  The following table depicts the Company's prepetition capital structure, exclusive of accrued but unpaid interest and fees:[3]

---

[3] The table set forth herein is not consistent with the Debtors' books and records because their books and records did not account for the contingent guarantee obligation under the First Lien Term Loan Facility. Therefore, the Debtors' books and records reflect total liabilities of approximately $14 million rather than the $79 million figure set forth in the table.

14

| Type of Debt | Maturity | Approximate Amount Outstanding As of Petition Date |
|---|---|---|
| Guarantee of First Lien Term Loan Facility | December 31, 2019 | $66,430,256 |
| 2017 Canton Loan | February 27, 2022 | $1,800,000 |
| 2019 Canton Loan | April 15, 2024 | $2,200,000 |
| CP Livingston Loan | November 22, 2022 | $176,000 |
| CP Jacksonville Loan | December 30, 2030 | $2,200,000 |
| CP Global Promissory Note | On Demand | $10,200,000[4] |
| Total | | $83,006,256 |

     A.       **First Lien Term Loan Facility.**

     12.      On July 11, 2017, CP Global, Inc. ("CP Global"), as borrower, CP Assets Limited ("CP Assets"), as Cayman SPV, certain guarantors (collectively, the "Loan Parties") and Tor entered into that certain credit agreement dated July 11, 2017 (the "Credit Agreement").  The Credit Agreement governs the senior secured term loan facility (the "First Lien Term Loan Facility"), which is guaranteed by Guy Kwok-Hung Lam ("Lam") and several of CP Global's affiliates, including the Debtors.  The First Lien Term Loan Facility was issued in an aggregate principal amount of $29,500,000, with an initial maturity date of July 12, 2019.  The First Lien Term Loan Facility is secured by a first lien security interest in substantially all of the assets of CP Global and each guarantor other than Lam, including each of the Debtors.  As discussed in the First Day Declaration, the maturity date was extended to December 31, 2019 pursuant to the Waiver, Third Amendment and Joinder to Credit and Guaranty Agreement, dated as of June 22, 2019 (the "Third Amendment").  The First Lien Term Loan Facility accrued cash interest at 7% per annum and paid-in-kind interest at 10% per annum prior to the Events of Default discussed

---

[4] At least $3.7 million was funded directly from the proceeds of the First Lien Term Loan Facility.

herein, with a default rate of 27% paid-in-kind compounding quarterly (representing the sum of the cash interest rate and the paid-in-kind interest rate, plus 10%) that has been accruing since the events of default described herein and in the First Day Declaration.  As of the Petition Date, the First Lien Term Loan Facility has matured and approximately $66,430,256 in principal amount and interest remains outstanding.

13.    Under the Credit Agreement and its ancillary documents (collectively, the "Loan Documents"), Tor received the benefit of certain security in respect of the First Lien Term Loan Facility, including, among other things: (i) a security interest in substantially all of CP Global's assets (excluding its shares in non-debtor CP Assets),[5] granted by CP Global pursuant to a Security Agreement dated July 11, 2017; and (ii) a security interest in all amounts outstanding to the credit of CP Global's accounts opened with DBS Bank (Hong Kong) Limited with the account numbers 016-478-000060278840 (USD) MCISB and 016-478-000060250840 (USD) MCISB, and the debts represented by each of them, granted by CP Global pursuant to an Account Charge dated July 31, 2017; and (iii) a security interest in substantially all of the assets of each of the Guarantors other than Lam.

14.    In support of the First Lien Term Loan Facility, Lam provided, among other things: (i) a personal guarantee (the "Guarantee"); (ii) an equitable mortgage dated July 11, 2017, pursuant to which Lam charged by way of first equitable mortgage on all of his interest in one $1.00 ordinary share issued by CP Global and owned by Lam (comprising 100% of the issued share capital of CP Global) (the "CP Global Share"); (iii) a signed and undated letter of resignation as the sole director of CP Global (the "CP Global Director Resignation Letter") and a

---

[5]    Security was subsequently granted by CP Global over the shares in non-debtor CP Assets pursuant to an equitable mortgage, dated August 12, 2019.

signed director letter of authority dated July 11, 2017, which irrevocably authorized Tor to date the CP Global Director Resignation Letter in respect of CP Global whenever an Event of Default under the Credit Agreement occurred; and (iv) a signed and undated letter of resignation as the sole director of CP Assets (the "CP Assets Director Resignation Letter") and a signed director letter of authority dated September 6, 2019, which, *inter alia*, irrevocably authorized Tor to date the CP Assets Director Resignation Letter in respect of CP Assets whenever an Event of Default under the Credit Agreement occurred.

**B.      Subsidiary Debt and Guarantee Obligations**

15.      On February 27, 2017, non-Debtor affiliate CP Assisted Living 1 (TX) LLC executed a $2,125,000 promissory note in favor of Texas Republic Bank N.A. (the "2017 Canton Loan"), which is guaranteed by Lam and Bing Cong Lin ("Lin"), the director of Pacrim Capital International Inc., and Manager of PCII Holdings LLC.  The 2017 Canton Loan is secured by a first lien security interest in certain property located in Van Zandt County, Texas that is not collateral under the Credit Agreement or the DIP Loan, accrues interest at 5% per annum and matures on February 27, 2022.  As of the Petition Date, approximately $1.8 million in principal and interest is outstanding under the 2017 Canton Loan.

16.      On April 15, 2019, non-Debtor affiliate CP 13 executed a $2,300,000 loan agreement and accompanying promissory note between CP 13 (TX), LLC and Southside Bank, which is guaranteed by Lam, Lin, and each of the Debtors (the "2019 Canton Loan").  The 2019 Canton Loan is secured by a first lien security interest in certain real property located in Van Zandt County, Texas that is not collateral under the Credit Agreement or the DIP Loan, accrues interest at 5.163% per annum and matures on April 15, 2024.  As of the Petition Date, approximately $2.2 million in principal and interest is outstanding under the 2019 Canton Loan.

17.     On November 2, 2021, non-Debtor affiliate CP 16 (TX) LLC ("CP 16") executed a $2,650,000 promissory note in favor of Bank of Commerce, which is guaranteed by Debtor CP Holdings (the "CP Livingston Loan").  The CP Livingston Loan is secured by a first lien security in certain real property located in Livingston, Texas that is not collateral under the Credit Agreement or DIP Loan, accrues interest at 4.25% per annum and matures on November 22, 2022.  As of the Petition Date, approximately $176,000 in principal and interest is outstanding on the CP Livingston Loan.

18.     On December 22, 2020, non-Debtor affiliate CP Jacksonville (TX) LLC ("CP Jacksonville") executed a $2,250,000 promissory note in favor of Bank of Commerce, which is guaranteed by Debtor CP Holdings (the "CP Jacksonville Loan").  The CP Jacksonville Loan is secured by a first lien security interest in CP Jacksonville's assets, that is not collateral under the Credit Agreement or the DIP Loan, accrues interest at 3.5% per annum and matures on December 30, 2030.  As of the Petition Date, approximately $2.2 million in principal and interest is outstanding under the CP Jacksonville Loan.

**C.     CP Global Promissory Note**

19.     On July 26, 2017, Debtor CP Holdings executed that certain Revolving Line of Credit Promissory Note between CP Holdings, as maker, and CP Global, as payee (the "CP Global Promissory Note").  The CP Global Promissory Note is unsecured and accrues interest at the applicable mid-term annual federal rate and is payable on demand.  As of the Petition Date, approximately $10,200,000 in principal and interest is outstanding under the CP Global Promissory Note.

62815/0001-40809166v2

III.    **EVENTS LEADING TO THE CHAPTER 11 CASES.**

A.    **Loan Parties' Breach the Credit Agreement**

20.    During the term of the Credit Agreement and as acknowledged in the Third

Amendment, the Loan Parties repeatedly defaulted on their payment and covenant obligations.

As a result of those defaults, the Loan Parties and Tor negotiated the Third Amendment which

provided for (a) an extension of the Credit Agreement's maturity date to December 31, 2019,

with the ability to extend the maturity date to July 13, 2020, upon the occurrence of certain

events set forth in section 2.04(b) of the Credit Agreement as amended by the Third Amendment,

including payment of an extension fee and a pay down amount, and (ii) a conditional waiver of

the specified defaults upon the occurrence of certain conditions precedent.  Specifically, Part 5 of

the Third Amendment stated that the following waivers would occur, but only if the following

conditions precedent were met:

- the Payment Default would be waived upon the payment in full to Tor of the Unpaid Cash Interest on or before December 31, 2019;

- the interest that had accrued on the Unpaid Cash Interest at the default rate would be waived upon the payment of $1,229,764.13 to Tor on or before December 31, 2019; and

- each of the Specified Defaults, other than the Payment Default, would be waived upon the occurrence of each of the conditions precedent set forth in Part 2 of the Third Amendment; *provided* that the Country Garden Default would only be waived to the extent that the Loan Parties complied with section 6.15(c) of the Credit Agreement, as amended by the Third Amendment on and from the effective date of the Third Amendment.

B.    **Tor's Enforcement of Remedies.**

21.    On April 15, 2020, pursuant to the Loan Documents, Tor exercised certain

remedies, including, *inter alia*:  (i) Tor appointed John Howard Batchelor of FTI Consulting

(Hong Kong) Limited and Andrew Morrison of FTI Consulting (Cayman) Limited as receivers

and managers (the "Receivers") of the CP Global Share, and CP Global's assets and accounts;

(ii) Tor dated and presented the CP Global Director Resignation Letter and the CP Assets

Director Resignation Letter to CP Global and CP Assets, respectively; (iii) the newly appointed Receivers exercised their rights in respect of the CP Global Share and passed a written shareholder's resolution to, *inter alia*, accept Lam's resignation as the sole director of CP Global and to appoint FTI Director Services Limited as the new sole director (the "New Director") of CP Global; (iv) the New Director passed a written resolution of the board of directors of CP Global causing CP Global to pass a shareholder resolution in respect of CP Assets, to *inter alia*, accept Lam's resignation as the sole director of CP Assets and appoint the New Director as the sole director of CP Assets; (v) Tor appointed Timothy J. Dragelin of FTI as the sole manager or sole director, as applicable, of each of the Debtors and non-Debtors CP Assisted Living Management LLC, CP Home Care Vance LLC, CP Bibb Home Care Management LLC, CP Home Care Management LLC, CP Home Care Bibb LLC, Pacrim US (AL) LLC, CP Assisted Living 1 (TX) LLC, CP 4 (TX) LLC, CP 5 (TX) LLC, CP 10 (TX) LLC, CP 13 (TX) LLC, CP 14 (TX) LLC, CP 16 (TX) LLC, CPSL Property Holdings LLC, CP 19 (AL) LLC, CP 17 (AL) LLC, CP 21 (AL) LLC, CP 2 (TX) LLC, CP 3 (TX) LLC, CP 6 (TX) LLC, CP 7 (TX) LLC, CP 9 (TX) LLC, CP 11 (TX) LLC, CP 12 (TX) LLC, CP 15 (TX) LLC, CP 1 (AL), Inc., CP 2 (AL), Inc., CP Assisted Living 3, Inc., CP 4 (AL), Inc., CP 5 (AL), Inc., CP 6 (AL), Inc., CP 7 (AL), Inc., CP 8 (AL), Inc., CP 9 (AL), Inc., CP 12 (AL), Inc., CP 13 (AL), Inc., CP 14 (AL), Inc., CP 15 (AL), Inc., CP 8 (TX) LLC, Pacrim US Landco LLC, Pacrim US (TN) LLC, CPSL Funding LLC, CP TX Investment 1 LLC, CP TX Investment 2 LLC, CP TX Investment 3 LLC, Pacrim US Holdings (TX) LLC, and CP Texas Construction LLC.  On April 16, 2020, the Receivers and New Director issued a letter to Lam and the registered agent, Vistra (Cayman) Limited, notifying them of, *inter alia*, the appointments and changes to the boards of CP Global and CP Assets.

C.    **Tor's Notice of Foreclosure**

22.    Given the Loan Parties' history of breaching the Credit Agreement, their failure to repay the First Lien Term Loan Facility on the maturity date and their consequent failure to cure the defaults, on June 10, 2021, Tor provided the Debtors with a notice demanding repayment of their guarantee obligations and with a notice of its intent to foreclose on the Debtors' collateral securing the First Lien Term Loan Facility.  Tor, however, has agreed to forbear through and including June 20, 2021 to support the Debtors' reorganization efforts, including a sale of their assets pursuant to Section 363 of the Bankruptcy Code to maximize value for all stakeholders.

IV.    **Debtors' Need for Postpetition Financing**

23.    The Debtors require immediate access to liquidity to ensure that they are able to preserve the value of their estates and effectuate a going-concern sale for the benefit of all parties in interest and administer these chapter 11 cases.  Without such financing, the Debtors will be unable to successfully market and sell their assets and membership interests, let alone at a price that reflects their true value, causing immediate and irreparable harm to the value of the Debtors' estates to the detriment of all stakeholders.

24.    The Debtors, in consultation with their advisors and Marc Weinsweig, the Debtors' independent manager, reviewed and analyzed the Debtors' projected cash needs and prepared the Approved Budget—a 20-week projection (as updated from time to time in accordance with the terms of the DIP Facility) outlining the Debtors' postpetition cash needs during these Chapter 11 cases.[6]  The Debtors believe that the Approved Budget and their projections provide an accurate reflection of their funding requirements over the identified period, will allow them to meet their obligations—including the administrative expenses of the

---

[6] A copy of the initial 20-week Budget is attached as Exhibit B to the Interim Order.

chapter 11 cases—and are reasonable and appropriate under the circumstances.  As a result, the Debtors believe that the DIP Loan provides the Debtors sufficient liquidity to preserve and market their membership interests during the pendency of these cases.

**V.      Debtors' Efforts to Obtain Postpetition Financing**

25.      Before the Petition Date and as a result of the Events of Default, the Prepetition Lender informed the Debtors that it would stop advancing funds to the Debtors.  The Debtors, based on the prepetition liens and claims of the Prepetition Lender, assessed the futility of soliciting alternative sources before the Petition Date to provide financing to the Debtors during these Chapter 11 cases.  In exchange for providing post-petition financing, every financing source would have required a first-priority priming lien on all of the assets of the Debtors securing all amounts advanced by such lender.  The Prepetition Lender would not consent to such priming liens and would have argued that the Debtors could not have provided adequate protection for the proposed financing.  The Debtors and Prepetition Lender believe the Prepetition Lender to be under collateralized and the Debtors further believe that the possibility of obtaining priming financing or loans secured solely by an administrative claim are nonexistent.

26.      Accordingly, because of the Debtors' financial condition, the Prepetition Lender's unwillingness to subordinate to a new lender and the terms of the DIP Loan proposed by the DIP Lender, the Debtors determined that there would be little to gain from embarking on a futile search for alternative debtor in possession financing.  To that end, the Debtors and Tor have engaged in arm's-length negotiations regarding the most value-maximizing path forward.  The Debtors and Tor have negotiated the terms of the DIP Loan to ensure the Debtors have sufficient liquidity to operate their business while pursuing a sale of their assets.

62815/0001-40809166v2

**BASIS FOR RELIEF REQUESTED**

I.    **Debtors Should Be Authorized to Enter Into DIP Loan**

A.    **Entering Into DIP Loan Is Sound Exercise of Debtors' Business Judgment**

27.    Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below.  Courts grant a debtor-in-possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  Indeed, "courts will almost always defer to the business judgment of a debtor in the selection of the lender."  *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011).  *See also In re Barbara K. Enters., Inc.*, No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. Jun. 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

28.    Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances."  *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment

23

made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority

under the [Bankruptcy] Code"). Furthermore, in considering whether the terms of postpetition

financing are fair and reasonable, courts consider the terms in light of the relative circumstances

of both the debtor and the potential lender. This includes the recognition that a debtor may have

to enter into "hard bargains" to acquire funds for its reorganization. *In re Elingsen McLean Oil

Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986). Finally, the Court may also appropriately

take into consideration non-economic benefits offered by a proposed postpetition facility. As the

Bankruptcy Court for the Southern District of New York has explained:

> Although all parties . . . are naturally motivated to obtain financing
> on the best possible terms, a business decision to obtain credit from
> a particular lender is almost never based purely on economic
> terms. Relevant features of the financing must be evaluated,
> including noneconomic elements such as the timing and certainty
> of closing, the impact on creditor constituencies and the likelihood
> of a successful reorganization. This is particularly true in a
> bankruptcy setting where cooperation and established allegiances
> with creditor groups can be a vital part of building support for a
> restructuring that ultimately may lead to a confirmable
> reorganization plan. That which helps foster consensus may be
> preferable to a notionally better transaction that carries the risk of
> promoting unwanted conflict.

*In re ION Media Networks, Inc.*, No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y.

Jul. 6, 2009).

29.     The Debtors' determination to move forward with the DIP Loan is an exercise of

their sound business judgment following an extensive arm's-length negotiation process and

careful evaluation of available alternatives. Having analyzed the advantages and disadvantages

of the proposed DIP Loan as well as the lack of viable alternative sources of funding, the Debtors

believe that they have obtained the best financing available under the totality of the

circumstances and that the proposed DIP Loan will position the Debtors to maximize the value

of their estates. Accordingly, the Court should authorize the Debtors' entry into the DIP Loan.

B.       **Debtors Should Be Authorized to Grant Liens and Superpriority Claims**

30.     The Debtors propose to obtain the DIP Loan by providing security interests and liens as set forth in the DIP Agreement pursuant to section 364(c) of the Bankruptcy Code. Specifically, the Debtors propose to provide to the DIP Lender continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on the DIP Collateral.  The Debtors also seek authority to grant the DIP Lender super-priority claims.

31.     The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code]."  11 U.S.C. § 364(c).  *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).  A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code.  *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (holding credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *see also In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

32.     Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

(a)      the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

(b)      the credit transaction is necessary to preserve the assets of the estate; and

25

(c)     the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990).

33.     In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court "may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien." 11 U.S.C. § 364(c).

34.     As set forth above, the Debtors do not believe that alternative sources of financing are reasonably available.  Thus, the Debtors have determined that the DIP Loan provides the best opportunity available to the Debtors under the circumstances to fund these chapter 11 cases. Therefore, the Debtors submit that the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied. Accordingly, the Debtors request authority to grant the DIP Lender the liens and superpriority claims described in this Motion and in the DIP Orders.

**II.     Scope of Carve-Out Is Appropriate**

35.     The proposed DIP Liens and superpriority claims are each subject to the Carve-Out.  Without the Carve-Out, the Debtors and other parties in interest may be deprived of certain rights and powers because the services for which professionals may be paid in these chapter 11 cases would be restricted.  *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest

are sorely prejudiced").  The Carve-Out does not directly or indirectly deprive the Debtors'

estates or other parties in interest of possible rights and powers.  Additionally, the Carve-Out

protects against administrative insolvency during the course of these chapter 11 cases by

ensuring that assets remain for the payment of the Clerk of the Court or U.S. Trustee fees and

professional fees of the Debtors.

### III.    DIP Lender Should Be Deemed Good-Faith Lender Under Bankruptcy Code Section 364(e)

36.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to

collect on loans extended to a debtor, and its right in any lien securing those loans, even if the

authority of the debtor to obtain such loans or grant such liens is later reversed or modified on

appeal.  Specifically, section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under
> this section [364 of the Bankruptcy Code] to obtain credit or incur
> debt, or of a grant under this section of a priority or a lien, does not
> affect the validity of any debt so incurred, or any priority or lien so
> granted, to an entity that extended such credit in good faith,
> whether or not such entity knew of the pendency of the appeal,
> unless such authorization and the incurring of such debt, or the
> granting of such priority or lien, were stayed pending appeal.

37.     As explained herein and in the First Day Declaration, the terms of the DIP Loan

are the result of (a) the Debtors' reasonable and informed determination that the DIP Lender

offered the most favorable terms on which to obtain vital postpetition financing, and (b)

extensive arms'-length, good-faith negotiations between the Debtors and DIP Lender.  The

Debtors submit that the terms and conditions of the DIP Loan are reasonable and appropriate

under the circumstances, and the proceeds of the DIP Loan will be used only for purposes that

are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any

party to the DIP Loan other than as described herein.  Accordingly, the Court should find that the

62815/0001-40809166v2

DIP Lender is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

**IV.     Automatic Stay Should Modified on a Limited Basis**

38.     The Interim DIP Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Lender to file any financing statements, security agreements, notices of liens, and other similar instruments and documents in order to validate and perfect the liens and security interests granted to them under the Interim DIP Order.  The Interim DIP Order further provides that the automatic stay is modified as necessary to permit the Debtors to grant the DIP Liens to the DIP Lender and to incur all liabilities and obligations set forth in the Interim DIP Order.  Finally, the proposed Interim DIP Order provides that, following the occurrence of an Event of Default, the automatic stay shall be vacated and modified to the extent necessary to permit the DIP Lender to exercise all rights and remedies in accordance with the DIP Orders.

39.     Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases.  *See, e.g.*, *In re Magnum Hunter Res. Corp.*, No. 15-12533 (KG) (Bankr. D. Del. Dec. 15, 2015) (terminating automatic stay after event of default); *In re Peak Broad., LLC*, No. 12-10183 (PJW) (Bankr. D. Del. Feb. 2, 2012) (terminating automatic stay after occurrence of termination event); *In re TMP Directional Mktg., LLC,* No. 11-13835 (MFW) (Bankr. D. Del. Jan. 17, 2012) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Broadway 401 LLC*, No. 10-10070 (KJC) (Bankr. D. Del. Feb. 16, 2010) (same); *In re Haights Cross Commc'ns, Inc.*, No. 10-10062 (BLS) (Bankr. D. Del. Feb. 8, 2010) (same).

62815/0001-40809166v2

## V.    Request for Interim Hearing:  Failure to Obtain, on an Interim Basis, Immediate Access to the DIP Facility Would Cause Immediate and Irreparable Harm

40.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than fourteen (14) days after the service of such motion.  However, Bankruptcy Rules 4001(b)(2) and (c)(2) allow the Court to (i) hold a preliminary expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral if so requested and (ii) authorize, to the extent necessary to avoid immediate and irreparable harm to the estate, the use of cash collateral or the obtaining of credit.

41.     The Debtors request that the Court hold a hearing to consider entry of the Interim DIP Order authorizing the Debtors—in the period from and after entry of the Interim DIP Order until the Final Hearing—to borrow funds under the DIP Facility in accordance with the Approved Budget.

42.     The Approved Budget was developed by the Debtors and their professionals, and together with the DIP Lender, to ensure that the Debtors have sufficient funds to operate their business in the ordinary course while running a value-maximizing sale process and paying their administrative expenses.  Further, the Approved Budget contemplates that in the period from and after entry of the Interim DIP Order until the Final Hearing the Debtors will use only those funds necessary to avoid immediate and irreparable harm.

## WAIVER OF BANKRUPTCY RULE 4001(A)(3)

43.     Bankruptcy Rule 4001(a)(3) provides that an "order granting a motion for relief from an automatic stay made in accordance with Rule 4001(a)(1) is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  As explained herein, access to the DIP Loan is essential to prevent irreparable damage to the Debtors' estates.

62815/0001-40809166v2

44.     Accordingly, ample cause exists to justify the waiver of the 14-day stay imposed by Bankruptcy Rule 4001(a)(3), and the Debtors requests of waiver of the stay, to the extent such stay applies.

## WAIVER OF BANKRUPTCY RULES 6004(A) AND (H)

45.     To implement the relief requested in this Motion, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).  As explained above, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors, such that there is ample cause to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

## RESERVATION OF RIGHTS

46.     Nothing contained in this Motion or any actions taken by the Debtors pursuant to relief granted in the Interim DIP Order and the Final DIP Order is intended to or should be construed as:  (a) an admission as to the validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; or (f) a waiver or limitation of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law.

62815/0001-40809166v2

## NOTICE

47.     The Debtors will provide notice of this Motion to: (a) the Office of the United States Trustee for the District of Delaware; (b) the holders of the 20 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the Debtors' secured lender; (d) the United States Attorney's Office for the District of Delaware; and (e) any other parties entitled to notice pursuant to Local Rules 2002-1(b) and 9013-1(m).  As this Motion is seeking "first day" relief, the Debtors will serve this Motion and any order entered with respect to this Motion as required by Local Rule 9013-1(m)(iii).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## NO PRIOR REQUEST

48.     No prior request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request entry of the Interim and Final orders, (a) granting the relief requested herein, and (b) granting such other relief as is just and proper.

Dated: June 20, 2021
     Wilmington, Delaware

**COLE SCHOTZ P.C.**

*/s/ Patrick J. Reilley*
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile: (302) 574-2103
Email: preilley@coleschotz.com

- and -

Warren A. Usatine (*pro hac vice* pending)
Felice R. Yudkin (*pro hac vice* pending)
Matteo Percontino (*pro hac vice* pending)
25 Main Street
Hackensack, NJ 07601
Telephone: (201) 489-3000
Facsimile: (201) 678-6261
Email: wusatine@coleschotz.com
       fyudkin@coleschotz.com
       mpercontino@coleschotz.com

*Proposed Counsel to Debtors and Debtors in Possession*

**EXHIBIT A**

**Proposed Interim DIP Order**