**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| CP Holdings LLC, *et al.,* | Case No. 21- (__) |
| Debtors.[1] | (Joint Administration Requested) |

**DECLARATION OF MARC WEINSWEIG,**
**INDEPENDENT MANAGER OF THE DEBTORS,**
**IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Marc Weinsweig, hereby declare under penalty of perjury:[2]

1.     I am an independent manager of CP Holdings LLC ("CP Holdings") and Pacrim

U.S. LLC ("Pacrim"), the above-captioned debtors and debtors in possession (collectively, the

"Debtors"), positions which I have held since I was appointed by the Debtors' members on or

about June 7, 2021.  I am the sole independent manager with authority to make decisions and act

on behalf of the Debtors with respect to their restructuring efforts, including, among other things,

their decisions to file petitions for relief under chapter 11 of title 11 of the United States Code (the

"Bankruptcy Code"), enter into the DIP Agreement, and enter into the APA.

2.     I am a Principal at Weinsweig Advisors, which I founded in 2010.  I received my

B.S. in finance from Pennsylvania State University in 1989, and my M.B.A. from Carnegie Mellon

University in 1993.  I have more than 20 years of interim management, performance improvement,

and business restructuring experience.  Since founding Weinsweig Advisors, I have served in

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification
number, as applicable, are as follows: CP Holdings LLC (6188) and Pacrim U.S. LLC (0479).  The Debtors'
mailing address is 3141 Hood Street, Suite 220, Dallas, TX 75219 c/o Sean Broadbent (solely for purposes
of notices and communications).

[2]     Capitalized terms used but not immediately defined have the meanings ascribed to them elsewhere in
this Declaration (defined below).

interim positions including, Chief Financial Officer, Chief Operating Officer, Chief Executive Officer, and Chief Restructuring Officer for several companies to preserve and enhance value during periods of transition.

3.      Based on my work as a manager of the Debtors, I am generally familiar with the Debtors' day-to-day operations, business, and financial affairs.  I submit this declaration (this "Declaration") in connection with: (a) the Debtors' petitions for relief under chapter 11 of the Bankruptcy Code filed on the date hereof (the "Petition Date") with the United States Bankruptcy Court for the District of Delaware (the "Court") and (b) the relief requested by the Debtors pursuant to the pleadings listed herein (collectively, the "First Day Motions").

4.      Except as otherwise indicated, all facts and statements set forth in this Declaration are based upon (a) my personal knowledge or opinion, (b) information obtained from members of the Debtors' management team, employees, and advisors, (c) the Debtors' books and records maintained in the ordinary course of their business, or (d) my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives.

5.      I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtors.  If called upon to testify, I could and would testify competently to the statements set forth in this Declaration, as the information in this Declaration is accurate to the best of my knowledge.

## PRELIMINARY STATEMENT

6.      The Debtors and their non-Debtor subsidiaries (collectively, the "Company") have their corporate headquarters in Dallas, Texas.  Debtor CP Holdings is incorporated in Nevada and Debtor Pacrim is incorporated in Delaware.  The Company's core business is developing, and operating aged-care assisted living and memory care residences owned in whole or part by the Company and third parties.  The  Company's owned and managed facilities are currently located in the States of Alabama and Texas.

62815/0001-40847820v5

7.      The Debtors are each guarantors under that certain credit agreement dated July 11, 2017, between CP Global, Inc. ("CP Global"), as borrower, CP Assets Limited ("CP Assets"), as the Cayman SPV, the guarantors party thereto, and Tor Asia Credit Master Fund LP ("Tor"), as lender (as amended, modified, or supplemented from time to time, the "Credit Agreement"). Pursuant to the Credit Agreement, Tor loaned $29,500,000 (the "Loan") to non-debtor CP Global. The Loan is guaranteed by several CP Global affiliates, including the Debtors, several non-Debtor subsidiaries of the Debtors, and Guy Kwok-Hung Lam ("Lam") (collectively, the "Guarantors," and with CP Global and CP Assets, collectively, the "Loan Parties"), and is secured by, among other things, the equity interests owned by each Debtor in their respective subsidiaries.  I understand that Lam was CP Global's sole director at the time the Credit Agreement was entered into.

8.      In connection with my appointment as the independent manager of the Debtors, I, in consultation with the Debtors' advisors, conducted an investigation and analysis of the Credit Agreement and its ancillary documents (collectively, the "Loan Documents") as well as the extent, validity and priority of Tor's liens.  I have reviewed the Loan Documents and I believe that the Credit Agreement is a valid, legally binding and enforceable contract and the Loan constitutes a valid, legally binding and enforceable debt.

9.      Based on my review of the Loan Documents and the Waiver, Third Amendment, and Joinder to Credit and Guaranty Agreement, dated as of June 22, 2019 (the "Third Amendment"), in particular, I learned that during the term of the Credit Agreement, the Loan Parties repeatedly defaulted on their payment and covenant obligations, as described more fully in Part III herein.  For example, the Third Amendment states that the Loan Parties failed to (i) repay the Loan in full on the maturity date, (ii) make several required interest payments and (iii) honor

certain covenants, including guaranteeing a loan provided by another lender to an affiliate of CP Global and incurring liens on certain property in violation of covenants specific to Lam's conduct as personal guarantor of the Credit Agreement.  CP Global acknowledged the occurrence of each of these defaults in the Recitals to the Third Amendment.

10.     Pursuant to the Third Amendment, CP Global was required to either remit certain payments to further extend the maturity date or repay the outstanding balance by the December 31, 2019 maturity date.  I have not been told nor have I been provided any evidence that CP Global made either of those required payments.  Indeed, Tor has advised that CP Global failed to make the requisite payments and, without further notice, an event of default under the Credit Agreement occurred. Accordingly, I do not believe that any of the conditional waivers set forth in the Third Amendment ever came into effect.

11.     Based on my review of documents regarding the Loan Parties' history with Tor, I learned that on April 15, 2020, pursuant to the Loan Documents and as a result of the outstanding Events of Default thereunder, Tor exercised certain remedies, including, *inter alia*, appointing receivers to CP Global and voting the stock of certain of its guarantor affiliates to replace the managers of the guarantor affiliates with Tim Dragelin from FTI Consulting, Inc. ("FTI"), including each of the Debtors.  Following Tor's exercise of remedies, I understand that Lam filed lawsuits against Tor in Texas and New York and Tor filed a bankruptcy petition against Lam in Hong Kong.  I also understand that Lam asserts claims in the Texas action against Andrew Oksner ("Oksner"), the Debtors' president.

12.     On June 10, 2021, Tor provided the Debtors with a notice demanding repayment of their guarantee obligations and with a notice of its intent to foreclose on the Debtors' collateral securing the Loan (the "Foreclosure Notice").  Tor, however, agreed to forbear through and

62815/0001-40847820v5

including June 20, 2021 to support the Debtors' reorganization efforts, including a sale of their assets pursuant to Section 363 of the Bankruptcy Code to maximize value for all stakeholders.

13.     Accordingly, the Debtors and Tor negotiated a $1.5 million debtor in possession loan facility, with the potential to increase the facility to $3.0 million total (the "DIP Loan"), to ensure the Debtors have sufficient liquidity to successfully pursue that sale.  Additionally, the Debtors and Tor negotiated an asset purchase agreement (the "APA") pursuant to which Tor will credit bid all of its secured claims arising under the DIP Loan and $14,935,003 of its secured claims arising under the Credit Agreement as consideration for substantially all of the assets of Debtors CP Holdings and Pacrim, subject to higher and better offers through a marketing process conducted by the Debtors' investment banker Anderson LeNeave & Co.  (the "Banker").  The assets subject to the APA consist of CP Holdings' and Pacrim's assets and membership interests in each of their direct subsidiaries.  Because Tor intends to purchase the membership interests in CP Holdings' and Pacrim's subsidiaries, I understand that Tor will assume all the liabilities of such entities, and Tor will also assume certain liabilities of the Debtors.  As such, a sale will not negatively impact the business operations of the Company's subsidiaries.  Moreover, the Chapter 11 cases are intended to resolve any and all disputes regarding Lam's challenges to Tor's secured claims and its exercise of remedies.  Such resolution will accrue to the benefit of the Debtors and their stakeholders, and allow the Debtors to focus on operating their business without the cost and distraction of the currently pending litigation against Tor and Oksner.  I believe the contemplated transaction is in the best interest of the Debtors, their estates, and their stakeholders, including the residents at the Company's facilities.

62815/0001-40847820v5

14.     To assist the Court and parties-in-interest in understanding the Debtors, their business, the circumstances leading to these chapter 11 cases, and the relief the Debtors are seeking in the First Day Motions, I have organized the balance of this Declaration as follows:

- **Part I** provides an overview of the Company's corporate history and operations;
- **Part II** provides an overview of the Debtors' corporate and prepetition capital structure;
- **Part III** describes the events leading to these chapter 11 cases;
- **Part IV** describes the Debtors' proposed debtor in possession financing and sale process; and
- **Part V** sets forth the evidentiary support for the First Day Motions.

## I.    The Company's Corporate History and Operations.

15.     The Company's business is focused on developing and operating rural-based aged-care assisted living and memory care facilities in Alabama and Texas.  The Debtors wholly own forty-seven (47) non-debtor subsidiaries and partially own three (3) non-debtor subsidiaries.  Ten (10) of the non-debtor subsidiaries operate facilities under the Company's controlled brand "Country Place Senior Living."  In addition, the Debtors have a minority interest in one County Place Senior Living operating facility as well an additional one that is under construction. The Company also provides management services for a third-party owned facility.

16.     The Company seeks to serve America's rural-based seniors and their families by designing and operating comfortable and homelike 24-suite residential style assisted living facilities.  The Company's memory care facilities are specifically designed for seniors living with memory challenges.  CPH is a holding company and has no employees.  CPH's subsidiary, Pacrim, has six (6) employees who provide overall strategic, operational and finance leadership, as well as accounting and development services.  Pacrim does not generate its own income.

17.     The Company's non-debtor subsidiaries generally fund their individual operations and obligations from the revenue generated from business operations.  They do not rely on funding

from the Debtors to operate their business. Debtor Pacrim, however, serves as manager and paymaster for the non-debtor subsidiaries' payroll as well as certain overhead costs including insurance and professional fees.

## II.    THE DEBTORS' PREPETITION CORPORATE AND CAPITAL STRUCTURE.

18.     A corporate structure chart of the relevant parties implicated in these chapter 11 cases is attached hereto as Exhibit A.

19.     As of the Petition Date, the Company's liabilities total approximately $83,006,256. The following table depicts the Company's prepetition capital structure, exclusive of accrued but unpaid interest and fees:

| Type of Debt | Maturity | Approximate Amount Outstanding As of Petition Date |
|---|---|---|
| **Guarantee of First Lien Term Loan Facility** | December 31, 2019 | $66,430,256 |
| **2017 Canton Loan** | February 27, 2022 | $1,800,000 |
| **2019 Canton Loan** | April 15, 2024 | $2,200,000 |
| **CP Livingston Loan** | November 22, 2022 | $176,000 |
| **CP Jacksonville Loan** | December 30, 2030 | $2,200,000 |
| **CP Global Promissory Note** | On Demand | $10,200,000[3] |
| **Total** | | $83,006,256 |

### A.    First Lien Term Loan Facility.

20.     On July 11, 2017, CP Global entered into the Credit Agreement. The Credit Agreement governs the senior secured term loan facility (the "First Lien Term Loan Facility"), which is guaranteed by Lam and several of CP Global's affiliates, including the Debtors. The First Lien Term Loan Facility was issued in an aggregate principal amount of $29,500,000, with an initial maturity date of July 12, 2019. The First Lien Term Loan Facility is secured by a first lien

---

[3] At least $3.7 million was funded directly from the proceeds of the First Lien Term Loan Facility.

62815/0001-40847820v5

security interest in substantially all of the assets of CP Global and each Guarantor other than Lam, including each of the Debtors.  As discussed above and further below, the maturity date was extended pursuant to the Third Amendment to December 31, 2019.  The First Lien Term Loan Facility accrued cash interest at 7% per annum and paid-in-kind interest at 10% per annum prior to the Events of Default discussed herein, with a default rate of 27% paid-in-kind compounding quarterly (representing the sum of the cash interest rate and the paid-in-kind interest rate, plus 10%) that has been accruing since the Events of Default.  As of the Petition Date, the First Lien Term Loan Facility has matured and approximately $66,430,256 in principal amount and accrued interest and fees remains outstanding.

21.     Under the Loan Documents, Tor received the benefit of certain security in respect of the Loan, including, among other things: (i) a security interest in substantially all of CP Global's assets (excluding its shares in non-debtor CP Assets),[4] granted by CP Global pursuant to a Security Agreement dated July 11, 2017; and (ii) a security interest in all amounts outstanding to the credit of CP Global's accounts opened with DBS Bank (Hong Kong) Limited with the account numbers 016-478-000060278840 (USD) MCISB and 016-478-000060250840 (USD) MCISB, and the debts represented by each of them, granted by CP Global pursuant to an Account Charge dated July 31, 2017 (the "Account Charge"); and (iii) a security interest in substantially all of the assets of each of the Guarantors other than Lam.

22.     In support of the Loan, Lam provided, among other things: (i) a personal guarantee (the "Guarantee"); (ii) an equitable mortgage dated July 11, 2017, pursuant to which Lam charged by way of first equitable mortgage on all of his interest in one $1.00 ordinary share issued by CP Global and owned by Lam (comprising 100% of the issued share capital of CP Global) (the "CP

---

[4]     Security was subsequently granted by CP Global over the shares in non-debtor CP Assets pursuant to an equitable mortgage, dated August 12, 2019.

Global Share"); (iii) a signed and undated letter of resignation as the sole director of CP Global (the "CP Global Director Resignation Letter") and a signed director letter of authority dated July 11, 2017, which irrevocably authorized Tor to date the CP Global Director Resignation Letter in respect of CP Global whenever an Event of Default under the Credit Agreement occurred; and (iv) a signed and undated letter of resignation as the sole director of CP Assets (the "CP Assets Director Resignation Letter") and a signed director letter of authority dated September 6, 2019, which, *inter alia*, irrevocably authorized Tor to date the CP Assets Director Resignation Letter in respect of CP Assets whenever an Event of Default under the Credit Agreement occurred.

### B.    Subsidiary Debt and Guarantee Obligations

23.    On February 27, 2017, non-Debtor affiliate CP Assisted Living 1 (TX) LLC executed a $2,125,000 promissory note in favor of Texas Republic Bank N.A. (the "2017 Canton Loan"), which is guaranteed by Lam and Bing Cong Lin ("Lin"), the director of Pacrim Capital International Inc., and Manager of PCII Holdings LLC.  The 2017 Canton Loan is secured by a first lien security interest in certain property located in Van Zandt County, Texas that is not collateral under the Credit Agreement or the DIP Loan, accrues interest at 5% per annum and matures on February 27, 2022.  As of the Petition Date, approximately $1.8 million in principal and interest is outstanding under the 2017 Canton Loan.

24.    On April 15, 2019, non-Debtor affiliate CP 13 executed a $2,300,000 loan agreement and accompanying promissory note between CP 13 (TX), LLC and Southside Bank, which is guaranteed by Lam, Lin, and each of the Debtors (the "2019 Canton Loan").  The 2019 Canton Loan is secured by a first lien security interest in certain real property located in Van Zandt County, Texas that is not collateral under the Credit Agreement or the DIP Loan, accrues interest at 5.163% per annum and matures on April 15, 2024.  As of the Petition Date, approximately $2.2 million in principal and interest is outstanding under the 2019 Canton Loan.

25.     On November 2, 2021, non-Debtor affiliate CP 16 (TX) LLC ("CP 16") executed a $2,650,000 promissory note in favor of Bank of Commerce, which is guaranteed by Debtor CP Holdings (the "CP Livingston Loan").  The CP Livingston Loan is secured by a first lien security in certain real property located in Livingston, Texas that is not collateral under the Credit Agreement or DIP Loan, accrues interest at 4.25% per annum and matures on November 22, 2022. As of the Petition Date, approximately $176,000 in principal and interest is outstanding on the CP Livingston Loan.

26.     On December 22, 2020, non-Debtor affiliate CP Jacksonville (TX) LLC ("CP Jacksonville") executed a $2,250,000 promissory note in favor of Bank of Commerce, which is guaranteed by Debtor CP Holdings (the "CP Jacksonville Loan").  The CP Jacksonville Loan is secured by a first lien security interest in CP Jacksonville's assets, that is not collateral under the Credit Agreement or the DIP Loan, accrues interest at 3.5% per annum and matures on December 30, 2030.  As of the Petition Date, approximately $2.2 million in principal and interest is outstanding under the CP Jacksonville Loan.

**C.      CP Global Promissory Note**

27.     On July 26, 2017, Debtor CP Holdings executed that certain Revolving Line of Credit Promissory Note between CP Holdings, as maker, and CP Global, as payee (the "CP Global Promissory Note").  The CP Global Promissory Note is unsecured and accrues interest at the applicable mid-term annual federal rate and is payable on demand.  As of the Petition Date, approximately $10,200,000 in principal and interest is outstanding under the CP Global Promissory Note.

III.    **EVENTS LEADING TO THE CHAPTER 11 CASES.**

A.    **Loan Parties Breach the Credit Agreement**

28.    During the term of the Credit Agreement and as acknowledged in the Third Amendment, the Loan Parties repeatedly defaulted on their payment and covenant obligations.  As a result of those defaults, the Loan Parties and Tor negotiated the Third Amendment which provided for (a) an extension of the Credit Agreement's maturity date to December 31, 2019, with the ability to extend the maturity date to July 13, 2020, upon the occurrence of certain events set forth in section 2.04(b) of the Credit Agreement as amended by the Third Amendment, including payment of an extension fee and a pay down amount, and (ii) a conditional waiver of the specified defaults upon the occurrence of certain conditions precedent.  Specifically, Part 5 of the Third Amendment stated that the following waivers would occur, but only if the following conditions precedent were met:

- the Payment Default would be waived upon the payment in full to Tor of the Unpaid Cash Interest on or before December 31, 2019;

- the interest that had accrued on the Unpaid Cash Interest at the default rate would be waived upon the payment of $1,229,764.13 to Tor on or before December 31, 2019; and

- each of the Specified Defaults, other than the Payment Default, would be waived upon the occurrence of each of the conditions precedent set forth in Part 2 of the Third Amendment; *provided* that the Country Garden Default would only be waived to the extent that the Loan Parties complied with section 6.15(c) of the Credit Agreement, as amended by the Third Amendment on and from the effective date of the Third Amendment.

29.    I am not aware that any of the Loan Parties made any required payments under the Third Amendment before December 31, 2019 or that any of the Loan Parties paid the extension fee or paid down the amount necessary to extend the maturity date to July 13, 2020.  Accordingly, I do not believe that any of the conditional waivers set forth in the Third Amendment ever came into effect.

30.     I also have not reviewed any documents evidencing a waiver of any defaults under the Credit Agreement by Tor, including the Loan Parties' payment by the December 31, 2019 maturity date.  Section 12.01 of the Credit Agreement (as amended by the Third Amendment) expressly provides that any amendment or waiver shall only be effective if executed in writing.  It is my understanding that Tor did not execute any further amendments or waivers in connection with the Credit Agreement beyond the Third Amendment.

**B.      Tor's Enforcement of Remedies.**

31.     On April 15, 2020, pursuant to the Loan Documents, Tor exercised certain remedies, including, *inter alia*:  (i) Tor appointed John Howard Batchelor of FTI Consulting (Hong Kong) Limited and Andrew Morrison of FTI Consulting (Cayman) Limited as receivers and managers (the "Receivers") of the CP Global Share, and CP Global's assets and accounts; (ii) Tor dated and presented the CP Global Director Resignation Letter and the CP Assets Director Resignation Letter to CP Global and CP Assets, respectively; (iii) the newly appointed Receivers exercised their rights in respect of the CP Global Share and passed a written shareholder's resolution to, *inter alia*, accept Lam's resignation as the sole director of CP Global and to appoint FTI Director Services Limited as the new sole director (the "New Director") of CP Global; (iv) the New Director passed a written resolution of the board of directors of CP Global causing CP Global to pass a shareholder resolution in respect of CP Assets, to *inter alia*, accept Lam's resignation as the sole director of CP Assets and appoint the New Director as the sole director of CP Assets; (v) Tor appointed Timothy J. Dragelin of FTI as the sole manager or sole director, as applicable, of each of the Debtors and non-Debtors CP Assisted Living Management LLC, CP Home Care Vance LLC, CP Bibb Home Care Management LLC, CP Home Care Management LLC, CP Home Care Bibb LLC, Pacrim US (AL) LLC, CP Assisted Living 1 (TX) LLC, CP 4 (TX) LLC, CP 5 (TX) LLC, CP 10 (TX) LLC, CP 13 (TX) LLC, CP 14 (TX) LLC, CP 16 (TX)

-12-

LLC, CPSL Property Holdings LLC, CP 19 (AL) LLC, CP 17 (AL) LLC, CP 21 (AL) LLC, CP 2 (TX) LLC, CP 3 (TX) LLC, CP 6 (TX) LLC, CP 7 (TX) LLC, CP 9 (TX) LLC, CP 11 (TX) LLC, CP 12 (TX) LLC, CP 15 (TX) LLC, CP 1 (AL), Inc., CP 2 (AL), Inc., CP Assisted Living 3, Inc., CP 4 (AL), Inc., CP 5 (AL), Inc., CP 6 (AL), Inc., CP 7 (AL), Inc., CP 8 (AL), Inc., CP 9 (AL), Inc., CP 12 (AL), Inc., CP 13 (AL), Inc., CP 14 (AL), Inc., CP 15 (AL), Inc., CP 8 (TX) LLC, Pacrim US Landco LLC, Pacrim US (TN) LLC, CPSL Funding LLC, CP TX Investment 1 LLC, CP TX Investment 2 LLC, CP TX Investment 3 LLC, Pacrim US Holdings (TX) LLC, and CP Texas Construction LLC.  On April 16, 2020, the Receivers and New Director issued a letter to Lam and the registered agent, Vistra (Cayman) Limited, notifying them of, *inter alia*, the appointments and changes to the boards of CP Global and CP Assets.

## C. Pending Litigation.

32.    As a result of Tor's legal enforcement of its rights and remedies under the Loan Documents, I understand that the several actions were initiated in various courts by Lam against both Tor and Oksner.   Additionally, I understand that Tor has sought relief against Lam in Hong Kong on account of his guarantee under the Credit Agreement.

## D. Restructuring Negotiations.

33.    Given the Loan Parties' history of breaching the Credit Agreement, their failure to repay the Loans in full on the maturity date and their consequent failure to cure such events of default, Tor issued the Foreclosure Notice seeking repayment of the Loan and all accrued interest from the Debtors and advising of its intention to foreclose on the Debtors' collateral securing the Loan. Tor, however, advised that it is willing to support the Debtors' reorganization efforts.

34.    To that end, the Debtors and Tor have engaged in vigorous, arm's-length negotiations regarding the most value-maximizing path forward.  The Debtors believe that the best path forward begins with the filing of these chapter 11 cases to continue their marketing and sale

-13-

process of the Debtors' assets to maximize the value of the estate for the benefit of the Debtors' stakeholders. The Debtors and Tor have negotiated the proposed DIP Loan to ensure the Debtors have sufficient liquidity to successfully operate their business while pursuing the sale contemplated in the APA or another value-maximizing transaction. Pursuant to the APA, Tor will credit bid the DIP Loan and $14,935,003 of the First Lien Term Loan Facility to purchase substantially all of Debtors CP Holdings' and Pacrim's assets, consisting primarily of their membership interests in their direct subsidiaries, if no better or higher offer materializes.

**IV.    DIP FINANCING AND SALE PROCESS.[5]**

35.    The DIP Loan and use of cash collateral will permit the Debtors to continue to fund their operations during the pendency of these chapter 11 cases, and ensure that the Debtors will have sufficient liquidity to successfully operate their business while pursuing their reorganization efforts through the sale process contemplated by the APA.

36.    The Debtors are in need of an immediate infusion of liquidity to ensure sufficient working capital to operate their business, administer their estates, and pursue their sale process. The DIP Loan will be utilized to fund critical overhead obligations to employees, professionals, insurance companies and the Debtors' landlord at their corporate headquarters, which expenses benefit both the Debtors and their non-debtor subsidiaries. The proceeds of the DIP Loan, however, will not flow from the Debtors to their non-debtor subsidiaries. Rather, the Debtors expect that the non-debtor subsidiaries will generate sufficient revenue during the Chapter 11 cases to upstream funds to the Debtors for partial payment of the Company's overhead costs. In the

---

[5]    Capitalized terms used in this section but not otherwise defined shall have the meanings ascribed to them in the DIP Motion or APA.

62815/0001-40847820v5

event the non-debtor subsidiaries lack sufficient liquidity to upstream such funds, the Debtors will draw on the DIP Loan to fund their corporate obligations.

37.    The Debtors' advisors have also determined that the DIP Loan is necessary to provide a positive message to the market that these chapter 11 cases are sufficiently funded, which is critical to address any concerns that may be raised by the Debtors' or their subsidiaries' customers, employees, or vendors.  Thus, immediate access to the DIP Loan and the continued use of cash collateral is crucial to the Debtors' efforts to preserve value for their stakeholders during these chapter 11 cases.

38.    Access to the DIP Loan will provide the Debtors with capital that is essential to (a) operate throughout these chapter 11 cases; (b) avoid irreparable harm to the Debtors' estates; and (c) provide the Debtors with sufficient runway to pursue a value-maximizing sale process.  In anticipation of the immediate need for the DIP Loan and the continued use of cash collateral, the Debtors' management, with the assistance of their advisors, prepared the Approved Budget (as defined in the DIP Order). I am familiar with the Approved Budget and its contents. I believe the Budget is fair, reasonable, and appropriate under the circumstances.

39.    The Debtors, with the assistance of their advisors, have determined that the DIP Loan should be sufficient to support the Debtors' operations through the pendency of these chapter 11 cases to fund the sale process and should be adequate, considering all available assets, to pay administrative expenses due or accruing during the period covered by the Budget.  Additionally, the DIP Loan will provide the Debtors with continued access to cash collateral, which relieves the Debtors of the cost of borrowing additional amounts to replace that cash.  The DIP Loan is also critical to the broader sale transaction contemplated by the APA.  I believe the DIP Documents are a reflection of good faith, arms'-length, vigorous negotiation among the Debtors and Tor. Without

62815/0001-40847820v5

access to postpetition financing and the continued use of cash collateral, the Debtors would suffer immediate and irreparable harm, and that the use of cash collateral alone would be insufficient to meet the Debtors' postpetition liquidity needs.

### A. The DIP Financing is the Best Financing Available.

40.     I understand that in late 2019 through early 2020, the Debtors attempted to partially refinance the Loan through additional financing from a third party bank.  I also understand that any financing from the bank required Tor to substantially release or diminish its security package over the Debtors' United States business, despite the fact that the potential bank loan was not in an amount sufficient to pay down all of Tor's existing loans.  I further understand that Tor was primarily concerned with the repayment of the Loan and was unwilling to entertain a substantial release of its security unless the Debtors contributed to funding the expected shortfall between the proposed bank loan and the outstanding amount of the Loan.  I understand that the proposed loan was never effective because, among other things, the loan agreement was never signed as the parties could not reach agreement.

41.     Before the Petition Date and as a result of the events of default, Tor informed the Debtors that it would stop advancing funds to the Debtors.  The Debtors, based on the prepetition liens and claims of Tor, assessed the futility of soliciting alternative sources before the Petition Date to provide financing to the Debtors during these Chapter 11 cases.  In exchange for providing post-petition financing, every financing source would have required a first-priority priming lien on all of the assets of the Debtors securing all amounts advanced by such lender.  Tor would not consent to such priming liens and indicated that they would have argued that the Debtors could not have provided adequate protection for the proposed financing.  The Debtors and Tor believe Tor to be under collateralized and the Debtors further believe that the possibility of obtaining priming financing or loans secured solely by an administrative claim are nonexistent.

-16-

42.     As set forth above, the Debtors would be unable to obtain unsecured credit allowable as an administrative expense, and were also unable to obtain credit: (a) having priority over that of administrative expenses; (b) secured by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (c) secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien.  I do not believe that the Debtors would be able to obtain financing on an unsecured basis pursuant to sections 364(b) and 503(b)(1) of the Bankruptcy Code, or even on a superiority basis under section 364(c)(1) of the Bankruptcy Code, on terms more favorable than those of the DIP Financing.  Moreover, the proposed DIP Financing serves as an important component of the Debtors' overall restructuring efforts because it provides the Debtors with the stability and certainty that they can pursue a robust post-petition marketing process and consummate a sale process in a timely and expeditious manner.

**B.     Sale Process.**

43.     With the support of Tor embodied in the APA, the Debtors are poised to run a sale process to ensure that value is maximized and distributed efficiently and appropriately.  After its engagement in June 2021, the Banker began development of marketing and solicitation materials and intends to conduct a marketing process to solicit higher and better offers.  The Banker will continue to solicit market interest from potentially interested parties during the Chapter 11 cases.

44.     I believe, with input from the Debtors' advisors, that the transactions contemplated under the proposed DIP Loan and proposed sale process comprise a viable path forward for the Company that will maximize the value of the Debtors' assets for the benefit of the estate and the Debtors' stakeholders, while ensuring that sufficient funds will remain to pay all administrative expenses of these chapter 11 cases and allowing for a responsible wind-down process after the proposed sale closes.  For these reasons and the other reasons described in this Declaration, I

believe that entry into the DIP Loan and the proposed sale process represent a value-maximizing path forward for the Debtors.

## V.      EVIDENTIARY SUPPORT FOR THE FIRST DAY MOTIONS.

45.     Concurrently with the filing of the Petitions, the Debtors filed the below-listed First Day Motions requesting relief that the Debtors believe is necessary to enable them to administer their estates with minimal disruption and loss of value during these chapter 11 cases.  The facts set forth in each of the First Day Motions are incorporated herein in their entirety.

### A.      ADMINISTRATIVE MOTIONS

- Creditor Matrix Motion. *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) File a Consolidated Creditor Matrix in Lieu of Submitting a Separate Creditor Matrix for Each Debtor and (B) File a Consolidated List of the Debtors' Twenty (20) Largest Unsecured Creditors and (II) Granting Related Relief*

- Joint Administration Motion. *Debtors' Motion for Entry of Order (I) Directing Joint Administration of Cases and (II) Waiving Certain Requirements of Bankruptcy Rule 2002(n)*

- Extension of Time to File Schedules Motion. *Debtors' Motion for Entry of Order Extending Time to File Schedules and Statements of Financial Affairs*

### B.      OPERATIONAL MOTIONS REQUIRING IMMEDIATE RELIEF

- Cash Management Motion. *Debtors' Motion for Entry of Interim and Final Orders Authorizing Continued (I) Use of Existing Cash Management System, Company Credit Card Program, Bank Accounts, and Business Forms and Payment of Related Prepetition Obligations, (II) Performance of Intercompany Transactions in the Ordinary Course of Business and (III) Granting Related Relief*

- Financing Motion. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Financing, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying Automatic Stay, and (IV) Granting Related Relief*

- Insurance Motion. *Debtors' Motion for Entry of Interim and Final Orders Authorizing Debtors to (I) Maintain Existing Insurance Policies and Pay all Insurance Obligations Arising Thereunder, (II) Renew, Extend*

-18-

*Supplement, Change, or Enter Into New Insurance Policies and (III) Continue Their Insurance Premium Finance Agreements*

- <u>Wages Motion</u>. *Debtors' Motion for Entry of Interim and Final Orders Authorizing Debtors to (I) Pay Prepetition Wages, Employee Expenses, and Other Compensation, (II) Maintain Employee Benefit Programs, and (III) Granting Related Relief*

46.     The First Day Motions request authority to pay certain prepetition claims.  I understand that the Federal Rules of Bankruptcy Procedure permit the Court to grant relief where such relief is necessary to avoid immediate and irreparable harm.  The Debtors have tailored their requests for immediate relief to those circumstances when the failure to receive such relief would cause immediate and irreparable harm to the Debtors and their estates.  I believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief described below could hinder the Debtors' operations and cause irreparable harm.  Other relief will be deferred for consideration at a later hearing.

47.     I have reviewed each of the First Day Motions, and the facts set forth in each First Day Motion are true and correct to the best of my knowledge and belief with appropriate reliance on corporate officers and advisors.  I believe that the relief requested in each of the First Day Motions is (a) necessary to allow the Debtors to operate with minimal disruption during the pendency of these chapter 11 cases, (b) critical in ensuring the maximization of value of the Debtors' estates and (c) serves the best interests of the Debtors' stakeholders.

## <u>CONCLUSION</u>

48.     The Debtors' ultimate goal in these chapter 11 cases is to achieve an orderly, efficient, consensual and successful sale to maximize the value of the Debtors' estates for their stakeholders.  To minimize any loss of value, the Debtors' immediate objective is to maintain a business-as-usual atmosphere during the course of these chapter 11 cases, with as little interruption or disruption to the Debtors' operations as possible.  I believe that if the Court grants the relief

requested in each of the First Day Motions, the prospect for achieving these objectives and completing a successful sale of the Debtors' businesses will be substantially enhanced.

62815/0001-40847820v5

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

statements are true and correct.

Dated:  June 20, 2021
Wilmington, Delaware

Name:  Marc Weinsweig
Title:  Independent Manager

## EXHIBIT A

## Corporate Structure Chart



## CP HOLDINGS OWNERSHIP STRUCTURE

Part 2 of 2

